```
                                                    USDC SDNY
                                                    DOCUMENT
                                                    ELECTRONICALLY  FILED
                                                    DOC #:_____
                                                    DATE FILED: 5/9/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X   :
JUAN FIGUEROA                                   :
                                                :
                    Plaintiff,                  :          **OPINION**
                                                :
          -against-                             :          21-CV- 577 (KHP)
COMMISSIONER OF SOCIAL SECURITY,                :
                                                :
                    Defendant.                  :   :
------------------------------------------------------------X

**KATHARINE H. PARKER, United States Magistrate Judge**:

Plaintiff Juan Figueroa ("Plaintiff"), represented by counsel, commenced this action

against Defendant, Commissioner of the Social Security Administration (the "Commissioner"),

pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of the

Commissioner's decision that he was not disabled from July 15, 2016, the onset date of his

alleged disability, through the date of the decision, May 29, 2020.[1]

For the reasons set forth below, the Court DENIES Plaintiff's motion and GRANTS the

Commissioner's motion for judgment on the pleadings.

## BACKGROUND

Plaintiff was born in 1978 in Puerto Rico and moved to New York in 2007.  (A.R. 45, 472.)

Plaintiff completed the 11th grade and subsequently obtained certificates as a mechanic and as

a porter.  (A.R. 45.)  Plaintiff can speak and write in Spanish but is limited in his ability to

communicate in English.  (A.R. 45-46.)  Plaintiff was incarcerated from December 2015 through

August 2017 for assault.  (A.R. 486, 494.)  Plaintiff suffers from schizoaffective disorder; poly-

---

[1] For the purposes of the instant motion, the parties stipulate that the alleged onset date is August 15, 2017.

substance abuse disorder in remission; lumbosacral degenerative disc disease; scoliosis; non-insulin dependent diabetes mellitus; and obesity.  (A.R. 25.)

### 1. *Procedural History*

On August 15, 2017, Plaintiff filed an application for Supplemental Security Income ("SSI") benefits alleging disability due to the physical and mental health impairments referenced above.  (A.R. 23.)  Plaintiff's claims were denied after initial review on December 15, 2017.  (*Id.*)  At Plaintiff's request, a hearing before Administrative Law Judge ("ALJ") Moises Penalver was held on December 20, 2019 in New York, NY.  (*Id.*)  Plaintiff appeared with counsel and testified at the hearing, with the assistance of a Spanish interpreter.  (*Id.*)  Vocational Expert ("VE") Elizabeth Laflamme and Impartial Medical Expert ("IME") Dr. Ira Hymoff also testified.  (*Id.*)  On May 29, 2020, ALJ Penalver denied Plaintiff's application.  (A.R. 7.)  Plaintiff appealed, and on November 30, 2020, the Appeals Council denied Plaintiff's appeal, making the ALJ's decision the Commissioner's final act.  (A.R. 1.)

Plaintiff commenced this action on January 22, 2021, asserting that: (1) the ALJ's own findings show that Plaintiff was in fact disabled; (2) the ALJ failed to properly evaluate the medical opinion of Plaintiff's treating providers; (3) the ALJ failed to consider Plaintiff's monthly absences; and (4) the ALJ failed to properly consider the Paragraph "B" Criteria of Listings 12.03 and 12.04.  (ECF Nos. 1, 26.)

### 2. *Summary of Relevant Medical Evidence*

Before the alleged onset date, between 2013 to 2015, Plaintiff was hospitalized multiple times and underwent treatment for cocaine and heroin addiction which caused Plaintiff to

suffer mental impairments including mood and psychotic disorders, hallucinations, and suicidal

ideations.  (*See* A.R. 313-323, 345-46, 369-371, 423, 568.)  He also previously received SSI

benefits because of his scoliosis but it was terminated upon his incarceration.  (A.R. 81-87.)

    *A.  Physical Impairments*

    On August 31, 2017, Plaintiff met with Dr. Nathaniel Brownlow at Project Renewal, for a

general examination and for follow-up visits on September 14 and October 12, 2017.  (A.R. 470-

84.)  Upon physical examination at the August visit, Plaintiff was in no acute distress, alert and

oriented, and well-nourished.  (A.R. 479.)  Plaintiff's musculoskeletal examination showed

normal ranges of motion of all joints.  (*Id.*)  The examination also showed that Plaintiff had

scoliosis with elevation of the right shoulder.  (*Id.*)  At the September follow-up, Dr. Brownlow

reported that Plaintiff was again in no acute distress.  (A.R. 476.)

    On November 15, 2017, Dr. Silvia Aguiar conducted a consultative examination of

Plaintiff.  (A.R. 499-504.)  Plaintiff complained of scoliosis, upper back pain, diabetes,

hypertension, high cholesterol, schizophrenia, and depression.  (A.R. 499.)  Plaintiff reported he

had severe spinal scoliosis since his childhood and that his back pain was aggravated by

bending and heavy lifting.  (*Id.*)  Plaintiff described the pain as sharp and throbbing with an

intensity of eight out of ten, but without radiation.  (*Id.*)  Upon examination, Plaintiff was in no

acute distress, had a normal gait and station, did not need help getting on and off the exam

table, and could rise from a chair without difficulty.  (A.R. 501.)  The examination further

showed his cervical spine, lumbar spine, shoulders, hips, and knees were normal.  (A.R. 501-02.)

Dr. Aguiar assessed scoliosis, upper back pain, diabetes, hypertension, high cholesterol,

schizophrenia, and depression. (A.R. 502.) Dr. Aguiar concluded Plaintiff's prognosis was fair

and opined that he had a mild limitation in heavy lifting and carrying due to the presence of

marked levoscoliosis. (*Id.*)

On December 14, 2017, Dr. Gary Ehlert, the state agency medical expert, prepared a

Medical Determinable Impairments and Severity Form where he opined that Plaintiff could lift

and carry 50 pounds occasionally, 25 pounds frequently, and could walk and/or stand for six

out of eight hours. (A.R. 97-98.)

On January 9, 2018, Nurse Practitioner ("NP") John Gargan, Plaintiff's treating NP for ten

years, completed a Medical Source Statement. (A.R. 511-17.) NP Gargan reported that Plaintiff

was diagnosed with chronic back pain, hypertension, obesity, and social anxiety disorder. (A.R.

511.) Plaintiff reported sharp pain with any exertional type activities and a constant dull ache.

(*Id.*) He rated his pain as an eight to nine out of ten. (*Id.*) Plaintiff had a reduced range of

motion of his back and lower extremities, impaired sleep, abnormal posture, tenderness,

trigger points, muscle spasm, muscle weakness, and positive straight leg raising test. (*Id.*)

Plaintiff had difficulty getting up from a sitting position and getting on and off the exam table.

(A.R. 512.) NP Gargan reported that Plaintiff frequently experienced pain severe enough to

interfere with his attention and concentration. (*Id.*)

NP Gargan opined that in an eight-hour workday, Plaintiff could sit for a total of 1 to 2

hours, stand/walk for a total of 3 hours, and would need to rest 2 hours. (A.R. 513-14.) He

further opined that Plaintiff could not lift or carry more than 10 pounds, or balance, stoop, or

forward or backward flex his neck. (A.R. 515-16.) A cane was medically required for both

4

walking and standing.  (A.R. 516.)  As a result of Plaintiff's impairment or treatment, he would

be absent from work about twice a month.  (A.R. 517.)  NP Gargan opined Plaintiff's condition

had existed and persisted with the restrictions as outlined in his Medical Source Statement

since at least 2005.  (*Id.*)

On January 16, 2018, NP Gargan provided Plaintiff with a letter stating that he had

treated Plaintiff for the past ten plus years.  (A.R. 519.)  He stated that Plaintiff had chronic

upper, middle, and low back pain.  (*Id.*)  Plaintiff had scoliosis with descent from the cervical

spine to T10 level.  (*Id.*)  His last MRI showed a herniated disc with foraminal spinal stenosis.

(*Id.*)  An updated MRI had been scheduled.[2]  (*Id.*)  NP Gargan reported that Plaintiff received

pain management services for back pain, including oxycodone and physical therapy.  (*Id.*)  He

had recommended that Plaintiff continue with treatment until pain was no longer relieved, at

which point surgery would be considered.  (*Id.*)

On April 10, 2019, NP Nancy Chez of HRH Care, performed a comprehensive

examination noting that Plaintiff's neck was supple and non-tender, and his back was

unremarkable.  (A.R. 690.)  He had normal ranges of motion of his extremities without joint

tenderness or swelling.  (*Id.*)  Plaintiff was alert and oriented times three, with no gross

neurological deficits, and no acute distress.  (*Id.*)  His motor strength was 5/5, and his gait was

normal.  (*Id.*)  In follow-up visits in August, September, and October 2019, NP Chez noted

Plaintiff's scoliosis at L5 but no acute distress, and she prescribed Gabapentin and Meloxicam

for lower back pain.  (A.R. 763, 766, 769.)

---

[2] The record does not discuss whether Plaintiff did in fact undergo the MRI, and if so, what the results showed.

*B. Mental Impairments*

After Plaintiff's release from prison, on August 24, 2017, Plaintiff met with Licensed Clinical Social Worker ("LCSW") Susan Kaskowitz at the Bridge Chemical Dependence Outpatient Rehabilitation Program (hereinafter "Bridge Program"). (A.R. 590, 607, 615.) Plaintiff's mood was euthymic, and his affect was full. (A.R. 615.) He was oriented, had good concentration, memory and attention span, and was currently stable on his psychiatric medications. (*Id.,* A.R. 621.)

On September 6, 2017, Dr. Arthur Middletown saw Plaintiff at Project Renewal (Plaintiff's transitional housing program) for a psychiatric evaluation. (A.R. 486.) Plaintiff denied hallucinations and stated that his mood was "fine." (A.R. 486-87.) Upon mental status examination, Plaintiff appeared well-kept, cooperative, alert and oriented, intact attention and memory. (A.R. 487.) Additionally, his psychomotor activity was normal, full affect, thought process was goal-directed with no loose or circumstantial thinking. (*Id.*) His fund of knowledge was average and had good impulse control, and good insight and judgement. (*Id.*) Dr. Middletown assessed schizoaffective disorder, depressive type, opioid use in remission, and cocaine abuse in remission and started Plaintiff on Risperdal. (A.R. 486-88.)

On September 15, 2017, Plaintiff was interviewed by John Saunders, a substance abuse counselor at the Bridge Program. (A.R. 651.) Plaintiff stated that he was currently stable on psychotropic medications and that the medications helped him to stay mentally fit. (*Id.*)

On October 3, 2017, Plaintiff met with Dr. Yeshwant Citalkar at Project Renewal for a psychiatric follow-up. (A.R. 490.) Plaintiff denied hallucinations and acknowledged that he only

heard voices when he was using drugs.  (*Id.*)  Upon mental status examination, he appeared

well-groomed, euthymic, no suicidal or homicidal ideations, and his judgment and insight were

good.  (*Id.*)

On October 10, 2017, Sean Backmon of FEDCAP, completed a functional report on

behalf of Plaintiff.  (A.R. 276-283.)  Backmon noted that when Plaintiff woke up, he took his

medication, showered and made breakfast, went to his programs, and then watched television

for the rest of the evening.  (A.R. 277.)  Plaintiff did not need reminders to groom himself or

take his medications.  (A.R. 278.)  He would also prepare meals two to three times a week that

would include rice, beans, and pork chops.  (*Id.*)  However, he could only perform minor chores

and would need to take breaks.  (*Id.*)  Plaintiff could also shop for his household and personal

needs.  (A.R. 279.)

On October 20, 2017, Dr. Gladys Frankel conducted a consultative psychiatric evaluation

of Plaintiff.  (A.R. 493-97.)  Dr. Frankel made a note that Plaintiff spoke primarily Spanish and

that a staff member at Industrial Medicine Associates (the office where Plaintiff was being

examined) translated during the interview.  (A.R. 493.)  Plaintiff denied depressive or anxiety-

related symptoms, as well as any phobic responses, trauma, panic attacks, manic symptoms,

thought disorder or cognitive deficits.  (A.R. 494.)  Plaintiff was cooperative, and his manner of

relating, social skills and overall presentation were adequate.  (*Id.*)  Dr. Frankel observed that

Plaintiff spoke fluently and with a clear voice.  (*Id.*)  Dr. Frankel did not comment on expressive

and receptive language skills because translation services were used during the examination.

(A.R. 495.)  Plaintiff's thought process was coherent and goal-directed with no evidence of

7

hallucinations, delusions, paranoia. (*Id.*) Plaintiff's affect was full range and appropriate to speech and thought content. (*Id.*) He reported that his mood was "bien." (*Id.*) His attention and concentration were mildly impaired. (*Id.*) He was able to count and do simple math, but slowly approached the serial 7s with mistakes. (*Id.*) He was able to do serial 3s slowly. (*Id.*) Plaintiff's recent and remote memory were mildly impaired. (*Id.*) He was able to recall 2 out of 3 objects after a delay. (*Id.*) Plaintiff's general fund of information was "somewhat limited to limited" and his insight was poor, and his judgment was fair to poor. (*Id.*)

Dr. Frankel noted that Plaintiff lived in a highly structured housing setting with mandatory expectation that he attends group counseling sessions. (A.R. 496.) He had a system for taking his medications, which was very well organized and helped him to function. (*Id.*) He was able to handle his personal care and grooming. (*Id.*) He reported that he cooked and did general cleaning once a week and did laundry. (*Id.*) Plaintiff stated that his wife shopped for him and managed his money because of his past drug abuse. (*Id.*) He stated that he was able to take public transportation. (*Id.*) Plaintiff denied that he had any friends, but stated he had a good relationship with his wife. (*Id.*)

Dr. Frankel opined that Plaintiff had moderate limitations in his ability to understand, remember or apply complex directions, use reason and judgment to make work-related decisions, and interact adequately with supervisors, co-workers, and the public. (*Id.*) He had mild limitations in his ability to understand, remember, or apply simple directions and instructions and sustain concentration and perform a task at a consistent pace. (*Id.*) He had no limitations in his ability to sustain an ordinary routine and regular attendance at work, regulate

emotions, control behavior, and maintain well-being; maintain personal hygiene and appropriate attire; awareness of normal hazards and taking appropriate precautions. (*Id.*)  Dr. Frankel opined that Plaintiff's difficulties were caused by psychiatric deficits. (*Id.*)  She assessed that the results of the evaluation appeared to be consistent with psychiatric problems that may significantly interfere with plaintiff's ability to function on a daily basis. (*Id.*)  She diagnosed schizophrenia and opioid abuse disorder, in remission. (A.R. 497.)  Dr. Frankel assessed that Plaintiff's impairment and need for therapy would last more than two years. (*Id.*)  She believed that Plaintiff had a good prognosis given that he was under a good structure. (*Id.*)

On December 12, 2017, Dr. H. Tzetzo, the state agency psychiatric consultant, prepared a Medical Determinable Impairments and Severity Form ("MDI"). (A.R. 93-100.)  Dr. Tzetzo opined that Plaintiff had moderate limitations in his abilities to interact with others; concentrate, persist, or maintain pace, or adapt or manage oneself. (A.R. 94.)  Dr. Tzetzo also opined that Plaintiff was not significantly limited in his abilities to carry out very short and simple instructions, and had moderate limitations in his ability to understand, remember, and execute detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to

9

criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to basic standards or neatness and cleanliness, respond appropriately to changes in the work setting, set realistic goals or make plans independently of others.  (A.R. 94-99.)

Citing Dr. Frankel's exam, Dr. Tzetzo noted that Plaintiff was living in supportive housing at Project Renewal.  (*Id.*)  He concluded that based on the evidence, Plaintiff's ability to deal with co-workers was somewhat reduced, but adequate to handle brief and superficial contact, and that his ability to tolerate and respond to supervision would be reduced, but adequate to handle an ordinary level of supervision in a work setting.  (A.R. 94-95.)

Plaintiff was admitted to the Bridge Program on October 11, 2017, to address his chemical dependence.  (A.R. 617-19.)  Plaintiff was to receive individual counseling once per week, group counseling ten times per week, and psychiatric treatment once per month.  (A.R. 619.)  Plaintiff was diagnosed with schizoaffective disorder, depressive type.  (A.R. 621.)  During this interview, Plaintiff was cooperative and pleasant.  (A.R. 652.)

On October 30, 2017, Plaintiff met with Elizabeth Cahn, Nurse Practitioner, Psychiatric ("NPP") at the Bridge Program.  (A.R. 653.)  Plaintiff was dressed adequately and well-groomed, reported that his mood was good, but NPP Cahn noted that his affect was guarded.  (A.R. 654.) Plaintiff had difficulty understanding English and was easily frustrated.  (*Id.*)  His current diagnosis was schizophrenia, and was to continue on Risperidone.  (*Id.*)  Plaintiff met with NPP Cahn on November 28 and December 27, 2017, and on January 24, April 11, May 9, and June 6, 2018.  (A.R. 657-58, 660, 662, 665-70).  At the last two sessions, Plaintiff's insight and judgment

were fair.  (*Id.*)  She reported that Plaintiff appeared neatly dressed and was well-groomed.

(A.R. 658, 660, 662, 665, 667, 670.)  His thought content and process were logical and goal

directed.  (*Id.*)  Plaintiff reported that he felt good on his medications.  (*Id.*)

On December 27, 2017, NPP Cahn completed a medical opinion statement.  (A.R. 506-

09.)  NPP Cahn checked boxes noting that Plaintiff suffered from mood disturbance, substance

dependence, anhedonia or pervasive loss of interests, psychomotor agitation or retardation,

paranoia or inappropriate suspiciousness.  (*Id.*)  NPP Cahn opined that as a result of Plaintiff's

impairments or treatment, he would miss work more than 3 times a month.  (A.R. 507.)  NPP

Cahn opined that Plaintiff had a marked loss in his ability to interact appropriately with the

public and respond appropriately to changes in a routine work setting and an extreme loss in

his ability to respond appropriately to accept instructions and respond appropriately to

criticism from supervisors.  (A.R. 508.)  She further opined that Plaintiff had a moderate loss in

his ability to remember locations and work-like procedures; understand and remember simple

or detailed instructions; carry out very short, simple instructions; maintain attention and

concentration for extended periods; maintain regular attendance, be punctual; sustain an

ordinary routine without special supervision; deal with the stress of semi-skilled and skilled

work; work in coordination with or proximity to others without being unduly distracted; make

simple work-related decisions; complete a normal workweek without interruptions from

psychologically based symptoms; perform at a consistent pace without an unreasonable

number and length of rest periods; get along with coworkers and peers without unduly

distracting them or exhibiting behavioral extremes, and use public transportation.  (A.R. 508-

11

09.)  She also opined that Plaintiff had moderate difficulties maintaining social functioning, no restrictions of his activities of daily living, no deficiencies of concentration or pace, nor any episodes of deterioration.  (*Id.*)

Plaintiff also met with his substance abuse counselor, David De la Rosa, weekly and attended daily and weekly substance counseling sessions beginning in September 2017.  (A.R. 651-58, 660-64, 666-67, 670-72).  These records show that Plaintiff was compliant with all of his programs, mental health appointments, and medications.  (A.R. 632, 635, 642, 657-58, 660-61, 670, 672).  Plaintiff also denied any psychiatric symptoms or side effects from his medication and was psychiatrically stable.  (A.R. 621, 627-28, 642, 657, 661, 664, 670, 672.)  Of note, these findings were "supported by psychiatric progress notes."  (A.R. 628.)

On March 30, 2018, Plaintiff met with De la Rosa, NPP Cahn and his primary case worker.  (A.R. 665.)  They informed Plaintiff that he was doing well and would be "stepped down," and referred for the work readiness program.  (*Id.*)  In April 2018, Plaintiff was attending the program more days than scheduled so that he could work in a stipend job.  (A.R. 666.)  NPP Cahn's notes reflect that in May 2018, he was working in the OASAS (Bridge Program) kitchen four days a week, and in June 2018, he was working five days a week.  (A.R. 667, 670.)  In June, NPP Cahn noted that Plaintiff was ready to move on to more independent housing and that his counselor helped him to apply for more independent housing.  (A.R. 670.)  In July 2018, Plaintiff reported that he had no problems "whatsoever" complying with his parole and found it easy once he started to focus on attending his program and his stipend job.

(A.R. 671.)  He stated that he left his "house" as soon as his curfew allowed and made it to his program or his job depending on the day, and then returned home.  (*Id.*)

Plaintiff's October 2018 treatment plan review at the Bridge Program indicated that he had completed and graduated from the rehabilitation program.  (A.R. 587-88; 646-47.)  Plaintiff was to be referred to a program of his choice for ongoing mental health treatment.  (A.R. 648.)  Upon discharge from the program on October 19, 2018, he was considered mentally stable and ready to work and/or go to school to obtain his GED or for culinary arts.  (A.R. 588.)

On February 15, 2019, Plaintiff was seen for a comprehensive psychosocial assessment by LCSW Marisol Martinez and for an additional comprehensive psychological assessment by NPP Aleen Boyd-McKoy on March 2, 2019.  (A.R. 702-05, 711-16.)  Plaintiff stated his Risperdal made him groggy when he woke up.  (A.R. 702, 711.)  He was also now on Suboxone treatment. (*Id.*)  Upon mental status examinations, Plaintiff was dressed and groomed appropriately, had appropriate motor activity, cooperative attitude, spontaneous speech, and rational, coherent, and appropriate thought form.  (A.R. 705, 713.)  He was not delusional, but his affect and mood were depressed.  (*Id.*)  His cognitive functioning was alert, and he was oriented to person, place, time, and situation.  (*Id.*)  Plaintiff's concentration, fund of knowledge, short term recall, insight, impulse control, recall/retention, long term recall, intellectual functioning, judgment and ability to abstract were good.  (A.R. 705, 713-14.)  LSCW Martinez and NPP Boyd-McKoy assessed major depressive disorder, recurrent in partial remission; opioid use disorder, mild, in early remission and on maintenance therapy; cocaine abuse in remission; and a history of schizophrenia.  (*Id.*)  NPP Boyd-McKoy started Plaintiff on Buspar and Ambien.  (A.R. 703.)

13

Plaintiff continued with medication management under the care of NPP Boyd-McKoy on March 30, April 27, June 6, and August 2, 2019 and generally reported that he was doing good or better, with less anxiety and improved sleep.  (A.R. 685, 696, 789, 779.)  His mental status examinations remained the same, except beginning in April, Plaintiff's affect was neutral or appropriate, and his mood was euthymic or better.  (A.R. 684, 696, 705, 713, 780, 790.)  NPP Boyd-McKoy continued to assess major depressive disorder, recurrent, in partial remission, opioid use disorder, mild, in early remission, cocaine abuse in remission, and history of schizophrenia.  (A.R. 685.)  But in August, schizoaffective disorder, unspecified type with psychotic features was diagnosed.  (A.R. 779.)

On September 3, 2019, Plaintiff was seen for a comprehensive psychiatric assessment by Dr. Karamchand Rameshwar.  (A.R. 771.)  Dr. Rameshwar noted that Plaintiff continued to live in a shared apartment through Project Renewal Transitional Housing.  (*Id.*)  Plaintiff reported feeling less depressed, but that sometimes, he felt overwhelmed and irritable, and continued to hear voices intermittently, but not of a command-type.  (*Id.*)  His mental status examination resembled to that of NPP Boyd-McKoy (noted above) but also notes that Plaintiff's insight and impulse control were fair and his judgment was good.  (A.R. 773.)  Plaintiff's assessments were schizoaffective disorder, unspecified with psychotic features; Major Depressive Disorder, recurrent, in partial remission; and opioid use disorder, mild, in early remission, and on maintenance therapy.  (A.R. 775.)

On January 18, 2019, Dr. Susan Santarpia conducted a psychiatric evaluation of Plaintiff. (A.R. 675-682.)  Plaintiff traveled by public transportation to the examination.  (A.R. 675.)  He

was accompanied by his friend, Epiphany Valentin, who served as an interpreter.  (*Id.*)  Plaintiff

reported that he lived alone and graduated from high school and had received special

education services.  (*Id.*)  Plaintiff reported sleep problems, dysphoric mood, excessive

apprehension, worry and auditory hallucinations.  (A.R. 675-76.)  He stated that the medication

decreased the intensity and frequency of auditory hallucinations to a very manageable level

and that they were very rare.  (A.R. 676.)  The mental status examination showed Plaintiff's

demeanor and responsiveness were cooperative, and his manner of relating and overall

presentation were adequate.  (*Id.*)  Dr. Santarpia reported Plaintiff's expressive and receptive

language were adequate, had a coherent and goal-directed thought processes with no evidence

of hallucinations, delusions, or paranoia in the evaluation setting.  (A.R. 676-77.)  She also

reported that Plaintiff's mood was euthymic, and his affect was full range and appropriate in

speech and thought content.  (A.R. 677.)  Plaintiff's attention and concentration were mildly

impaired.  (*Id.*)  He counted on his fingers for serial 3s and could not do serial 7s.  (*Id.*)  His

recent and remote memory skills were intact.  (*Id.*)  Plaintiff's cognitive function was estimated

to be in the average to low average range, with his general fund of information appropriate to

his experience.  (*Id.*)  His insight and judgment were fair.  (*Id.*)  Plaintiff was able to dress, bathe

and groom himself; he did his own cooking, cleaning, laundry, and shopping, could manage his

own money, and enjoyed socializing with friends and family.  (*Id.*)

Dr. Santarpia opined that Plaintiff was able to understand, remember, and apply simple

directions and instructions; use reason and judgment to make work-related decisions; sustain

concentration and perform a task at a consistent pace; sustain an ordinary routine and regular

15

attendance at work; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions, all within normal limits. (A.R. 678.) She further opined that Plaintiff had mild impairments in interacting adequately with supervisors, co-workers, and the public, regulating emotions, controlling behavior, and maintaining well-being. She opined that his difficulties were caused by his history of psychotic symptoms. (*Id.*) Plaintiff was diagnosed with schizophrenia, by history (with late onset, possibly due to stress, as Plaintiff would not elaborate; reportedly stabilized); and opiate dependent abuse by history. (*Id.*) She recommended consideration of vocational training and rehabilitation. (*Id.*) Plaintiff's prognosis was guarded. (*Id.*)

### 3. *Administrative Hearing*

At the administrative hearing, with the assistance of a Spanish translator, Plaintiff testified that at the beginning of 2019 he worked in a kitchen after he had completed his programs and therapy after his release from prison. (A.R. 46.) He testified that the job lasted only two months because he was under a lot of pressure at the job and had argued with a coworker. (*Id.*) He also attended the Bridge Program every week where he had urinalysis. (A.R. 48.) After completing the Bridge Program, Plaintiff continued to live in the residential program because he could not be placed in a shelter due to his mental impairments and because he was well-behaved and kept his appointments. (A.R. 48, 62.)

Plaintiff asserted that the program staff helped him with doctors' appointments. (A.R. 47.) The staff members were not present at the facility where he lived, but once a week a staff member would visit and bring his medication. (A.R. 47, 50.) In addition, staff helped by taking

16

him to apartment interviews and they sometimes took him to his doctor's appointments or

provided him with information he may need for his appointments.  (A.R. 62).

Plaintiff asserted that his wife did not live with him but that she helped him with

cooking, cleaning, shopping, and laundry.  (A.R. 47, 50.)  Plaintiff stated that without her help,

he could not do laundry or shopping because he would become frustrated and quickly lose

control.  (A.R. 51.)  Plaintiff claimed that his wife was always with him and helped him with

everything.  (A.R. 63.)  Plaintiff asserted that when he was not in the program environment, he

explodes when he is under a lot of pressure and given attitude.  (*Id.*)

Concerning his physical impairments, Plaintiff testified he had scoliosis and walked with

a cane when his back hurt.  (A.R. 49.)  Plaintiff did not believe he could sit for a long time, and

sometimes had to lie down during the day.  (A.R. 50.)

After being provided Plaintiff's residual functional capacity ("RFC") by the ALJ, VE

Laflamme opined that Plaintiff could be a housekeeper, a price marker, and a courier.  (A.R. 65-

66.)  The ALJ then asked VE Laflamme to consider a hypothetical individual with Plaintiff's age,

lack of work experience, and difficulty communicating in English, that is limited to sedentary

work and required a handheld assistive device, a cane for uneven terrain or prolonged

ambulation, and is limited to simple, routine, and repetitive tasks; limited to work in a low

stress job, defined as having no more than occasional decision making, no more than occasional

changes in the work setting.  Further, that the individual also cannot tolerate any strict

production quotas, no interaction with the public except for occasional interaction with

coworkers and supervisors, and would require a break every hour for two to three minutes, in

addition to regularly scheduled breaks.  (A.R. 66-67.)  VE Laflamme testified that the person

could be an escort driver, production sorter, or inspection table worker.  (A.R. 67-68.)

VE Laflamme further testified that if the person's psychiatric condition led to possible

outbursts, and the person were to get into a physical fist fight with coworkers or have such

animated arguments that they have to be broken up to prevent a physical fist fight, that type of

behavior would preclude working in the competitive market.  (A.R. 70.)

Dr. Ira Hymoff, a clinical psychologist, testified as a psychological expert.  (A.R. 52-53,

805-06.)  Based upon his review of the medical evidence, Dr. Hymoff testified that Plaintiff has

been diagnosed with schizoaffective disorder or major depressive disorder.  (A.R. 53-54.)  The

records suggested to Dr. Hymoff that Plaintiff had made great progress in dealing with his

mental impairments and although he carried a diagnosis of either schizophrenia or

schizoaffective disorder, Plaintiff was in a sort of remission, and his limitations were only at the

moderate level.  (A.R. 54-55.)  He was stable in his substance abuse treatment, and his

diagnosis of either schizophrenia or schizoaffective disorder did not seem to create as many

functional limitations as it had in the past.  (A.R. 55.)  In Dr. Hymoff's opinion, once the

substance abuse was in remission, treatment improved Plaintiff's symptoms and limitations,

and that Plaintiff's primary impairment was schizoaffective disorder with depressive symptoms.

(*Id.*)  Dr. Hymoff opined that Plaintiff's schizoaffective disorder did not satisfy the "B criteria," of

Listings §§ 12.03 and 12.04 because his limitations were primarily in the moderate level.  (A.R.

56.)  Dr. Hymoff testified that if, as Plaintiff testified, the program monitored his medication,

set up his medical appointments, a social worker checked on him once a week, and his wife

18

spent most of the day doing things like cooking, shopping, and cleaning for him, Plaintiff would

be "a little closer to" the "C" criteria of Listing.  (A.R. 59-60.)  However, Dr. Hymoff stated that

the January 18, 2019 consultative examination indicated that Plaintiff was able to dress, bathe,

groom himself, and do his own cooking, cleaning, laundering, shopping, and manage his own

money.  (A.R. 60.)

### 4. *The Commissioner's Decision*

ALJ Penalver found that Plaintiff was not engaged in substantial gainful activity and his

severe impairments were schizoaffective disorder; poly-substance abuse disorder in remission;

lumbosacral degenerative disc disease; scoliosis; non-insulin dependent diabetes mellitus; and

obesity, level 1.  (A.R. 25.)  The ALJ found that Plaintiff's physical and mental impairments did

not meet the Listings and had no more than moderate limitations in the various functional

areas.  (A.R. 26-27.)  Plaintiff had the RFC to perform light work with additional limitations.

(A.R. 27.)  Specifically, the ALJ determined that Plaintiff could lift or carry up to 20 pounds

occasionally and 10 pounds frequently, and could sit, stand, or walk up to six hours each in an

8-hour workday, with regularly scheduled breaks.  (*Id.*)  The ALJ further found that Plaintiff was

limited to simple, routine tasks and low-stress jobs, defined as positions with no more than

occasional decision-making or occasional changes in the work setting; could not tolerate strict

production quotas; was limited to occasional brief superficial contact with the public, and no

more than occasional interactions with co-workers and supervisors; and in addition to regularly

scheduled work breaks, require breaks every hour lasting for two to three minutes.  (*Id.*)

Of note, when weighing the evidence, ALJ Penalver discounted NPP Cahn's medical source statement because her opinion "was issued a mere four months after claimant was released from incarceration [on December 27, 2017] and does not take into consideration the extent of increased adherence and the resulting improvement in symptoms claimant experienced." (A.R. 31.) ALJ Penalver also found NP Gargan's opinion unpersuasive because it is "not supported by the contemporaneous treatment notes in the record, which show generally normal physical examinations" and Plaintiff's impairments have not required intensive or invasive treatment. (A.R. 32.)

The ALJ determined that Plaintiff had no past relevant work. (A.R. 32.) He further found that Plaintiff had a limited education and was able to communicate in English. (*Id.*) Considering Plaintiff's age, education and work experience, along with his RFC for a limited range of light work, and relying on vocational expert testimony, the ALJ determined that Plaintiff could work as a housekeeper, price marker, or courier. (A.R. 33.) Based upon VE Laflamme's testimony, ALJ Penalver further noted that at the sedentary level, Plaintiff may work as an escort driver, production sorter, inspection/table worker. (A.R. 33.) Accordingly, the ALJ determined that Plaintiff was not disabled. (*Id.*)

## DISCUSSION

### 1. Standard of Review

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir.

2013) (*per curiam*) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"); *id*. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g)[.]").

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*) (citation and internal quotation marks omitted).

In its review of this Claim, the Court also applies the frequently reiterated standards for entitlement to Social Security disability benefits, examination of the procedures employed and development of the record, evaluation of the medical and vocational evidence, and the evaluation of mental impairments as amended by the new regulations in 2017.  These standards, along with numerous authorities and citations, are discussed at length, merely by way of example, in *Vellone v. Saul*, 2021 WL 319354, at *1 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom., Vellone on behalf of Vellone v. Saul,* 2021 WL 2801138 (S.D.N.Y. July 6, 2021), which discussions are hereby incorporated by reference.

### 2. *Analysis*

As a threshold matter, the "court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (*quoting Scott v. Astrue,* 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010)). In this case, after a careful review, the Court finds ALJ Penalver's development of the record thorough and complete. As further discussed below, the Court finds that each of Plaintiff's arguments noted above are without merit. Each are discussed in turn.

ALJ Penalver's finding that Plaintiff was not disabled is supported by substantial evidence. Plaintiff contends that the ALJ failed to properly weigh and account for his structured environment in determining his functional limitations when the ALJ concluded he had moderate limitations in all of the "B" criteria ratings. At steps one through four of the Commissioner's assessment of disability, it is the claimant who bears the burden to show that he or she is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Colgan v. Kijakazi*, 22 F.4th 353, 358 (2d Cir. 2022) (citation omitted); *Jackson v. Kijakazi*, 2022 WL 620046, at *11 (S.D.N.Y. Mar. 3, 2022). Here, Plaintiff has not met his burden.

Although, Plaintiff was subject to weekly drug testing, a curfew, and mandatory counseling sessions, the record does not show Plaintiff would be disabled but for his structured environment, despite Dr. Frankel opining that his prognosis was good given he is under good structure. Here, the record shows that Plaintiff excelled in his structured environment at the Bridge Program and even attended extra sessions to be able to work additional hours at his

stipend job.  Throughout Plaintiff's time at the Bridge Program, the treatment records show

overall improvement month after month and unremarkable mental status examinations.

Furthermore, in June 2018 Plaintiff's treating NPP and substance abuse counselor, determined

he was stable enough to move to independent housing.  Additionally, and of note, IME Dr.

Hymoff testified that Plaintiff's failure to function outside of the structured program would

move him "closer" to the "C" Listings.  However, Dr. Hymoff did not make the determination

that Plaintiff satisfied the category "C" criteria and instead pointed to evidence in the record

that highlighted Plaintiff's ability to function.  Lastly, none of Plaintiff's mental healthcare

providers concluded that he would not be able to function outside of the structured

environment.  Further, none noted or opined that Plaintiff had significant impairments that

would render him disabled except for NPP Cahn, whose opinion the ALJ discounted (as further

discussed below).  To the contrary, the record shows that Plaintiff was looking for apartments

to move out of the structured setting.

　　　　To the extent Plaintiff contends the ALJ failed to properly evaluate NPP Cahn's

assessment of Plaintiff, the Court disagrees.  The ALJ properly discounted NPP Cahn's medical

source statement because he found it was not supported and consistent with the overall

record.  In arriving at a decision on disability, the Commissioner must consider several factors

including supportability and consistency.  *See Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955,

at *6 (S.D.N.Y. Oct. 21, 2021) (citing 20 C.F.R. §§ 404.1520c(c), 416.920c(c)).  Here, ALJ Penalver

noted that NPP Cahn's opinion was signed on December 27, 2017, a few months after Plaintiff's

release from prison and was inconsistent with the record as a whole in light of Plaintiff's

substantial progress since NPP Cahn's statement.  Applicable regulations state that the

relationship, length, and frequency a provider has with a claimant is a factor to be considered in

determining persuasiveness.  20 C.F.R. § 404.1520c(c).  However, the most important factors

are supportability and consistency.  20 C.F.R. § 404.1520c(b)(2).  Here, NPP Cahn's own

longitudinal treatment notes do not support the conclusion that Plaintiff has a marked loss or

an extreme loss in his ability to interact appropriately with the public, accept instructions and

respond appropriately to criticism from supervisors, and respond appropriately to changes in a

routine work setting.  In treating notes, dated after the medical source statement, NPP Cahn

notes the significant progress Plaintiff has made and that he was ready to move on to more

independent housing.  (*See e.g.,* A.R. 670.)

Further NPP Cahn's opinion is also not consistent with subsequent records by other

physicians.  By way of example, LCSW Martinez and NPP Boyd noted that Plaintiff's cognitive

functioning was alert, he was oriented to person, place, time, and situation.  They further noted

that Plaintiff's concentration, fund of knowledge, short term recall, insight, impulse control,

recall/retention, long term recall, intellectual functioning, judgment and ability to abstract were

good.  (A.R. 705, 713-14.)  Dr. Rameshwar and CE Dr. Santarpia's examinations of Plaintiff were

practically the same and did not note significant limitations.  It is only Dr. Frankel's opinion,

which predates NPP Cahn's statement, that notes moderate limitations and inconclusively

notes that Plaintiff's psychiatric impairments *may* significantly interfere with Plaintiff's ability to

function on a daily basis.  As no other provider's treatment records are consistent with or

supportive of NPP Cahn opinion, it was reasonable for ALJ Penalver to find it unpersuasive and properly explained the basis for his conclusion in accordance with applicable regulations.

Similarly, the ALJ properly discounted NP Gargan's medical opinion as to the impact of Plaintiff's scoliosis on his functioning despite the length of their relationship as there is evidence in the record showing NP Gargan's opinion is not entirely consistent or supported by the record. ALJ Penalver considered Plaintiff's 2011 MRI results and found it to contradict NP Gargan's opinion insofar that there was no evidence of cord compression, central canal stenosis or nerve root impingement or other objective clinical findings. (A.R. 29-31.) Furthermore, later examinations found Plaintiff to have normal gait, full range of motion in his lumbar and cervical spine, despite spinal curvature. Specifically, in late 2017, Dr. Nathaniel Brownlow found that Plaintiff was in no acute distress on multiple occasions, his musculoskeletal examination showed normal ranges of motion of all joints. (A.R. 476-79.) In November 2017, CE Dr. Aguiar found Plaintiff was in no acute distress, had a normal gait and station, did not need help getting on and off the exam table, and could rise from a chair without difficulty, and concluded his prognosis was fair and that he had only mild limitations in lifting and carrying heavy objects. In December 2017, Dr. Ehlert, the state agency medical expert, opined that Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, and could walk and/or stand for six out of eight hours. In 2019, NP Chez noted scoliosis but no acute distress, and prescribed Gabapentin and Meloxicam for lumbago. Of note, in mid-2018, Plaintiff was working a stipend job in a kitchen despite the limitations identified by NP Gargan, which further undercuts his claim that his physical impairments rendered him disabled. Accordingly, given the overall record, the ALJ

reasonably concluded that treating provider NP Gargan's opinion was not supported by or

consistent with the evidence in the record and thus unpersuasive and properly explained his

decision in accordance with the applicable regulations.  *See Tami Ann A. v. Comm'r of Soc. Sec.*,

2022 WL 938167, at *3, 5 (S.D.N.Y. Feb. 3, 2022), *report and recommendation adopted sub*

*nom*, *Albanese v. Comm'r of Soc. Sec* 2022 WL 929837 (S.D.N.Y. Mar. 29, 2022) (finding that the

ALJ reasonably concluded the physician's assessment to be inconsistent with other medical

opinion and evidence and "[c]onsistency is the extent to which an opinion or finding is

consistent with evidence from other medical sources and non-medical sources.") (internal

quotation and citation omitted); *Herrera*, 2021 WL 4909955, at *10-11 (finding that the ALJ

decision to find certain providers' assessments unpersuasive was supported by substantial

evidence).

Thus, after finding that both NPP Cahn and NP Gargan's opinion unpersuasive, ALJ

Penalver's decision to not give credence to the providers' conclusions about Plaintiff's

limitations –  such as monthly absences – was supported by substantial evidence.  There is

evidence in the record that Plaintiff had no issues with absenteeism when he attended sessions

and also worked in the kitchen.  (A.R. 665-68.)  The evidence also shows that Plaintiff was

compliant with his treatment schedule and even attended extra sessions.  (A.R. 670.)  This

indicates that Plaintiff could follow a schedule and supports a conclusion that Plaintiff would

not be absent from work as frequently as his providers suggested.  *See Schillo v. Kijakazi*, 31

F.4th 64 (2d Cir. 2022) (finding that the reasons the ALJ provided to discount the treating

physicians' opinions – that they "were conclusory, unhelpful with respect to assessing RFC, and

inconsistent with the objective medical evidence—were . . . supported by substantial evidence"); *Suarez v. Comm'r of Soc. Sec.*, 102 F. Supp. 3d 552, 582 (S.D.N.Y. 2015) (decision of ALJ to reject additional limitations assessed by two treating physicians was supported by substantial evidence); *see also Rivera v. Astrue*, 2012 WL 3307342, at *8 (E.D.N.Y. Aug. 11, 2012).

Plaintiff also contends that the ALJ erred in using Plaintiff's friend as a translator instead of a staff member during his consultative examination with Dr. Santarpia. Plaintiff points to some errors in Dr. Santarpia's opinion such as statements that Plaintiff had graduated from high school and that he lived alone and argues that Dr. Hymoff's assessment of Plaintiff's limitations is flawed because he relied on Dr. Santarpia's report. To start, Plaintiff points to no authority that requires a CE to rely on a specific type of translator or that the translator be otherwise qualified. With regard to the purported errors, Plaintiff reported that he lived alone and graduated from high school – Dr. Santarpia can't be faulted for what Plaintiff reported. And, in any event, that Plaintiff finished eleventh instead of twelfth grade did not factor into the ALJ's RFC determination. Similarly, there is no doubt that Dr. Hymoff and the ALJ understood that Plaintiff lived in the supportive housing community. Nonetheless, the Plaintiff's own reported activities of daily living and treatment records support the conclusion of moderate limitations. For example, portions of the record show Plaintiff could prepare meals (including rice, beans, and pork chops), shop for his needs, and did not need reminders to take his medication. (A.R. 278.) Other evidence shows that Plaintiff's counselors were readying Plaintiff to move out and begin work. (A.R. 665, 670.) Thus, in light of the overall

record, the errors identified in Dr. Santarpia's report do not change the Court's finding that the ALJ's decision is supported by substantial evidence.  *See Herrera*, 2021 WL 4909955, at *9 ("The district court conducts a plenary review of the administrative record to determine if there is substantial evidence supporting the ALJ's finding, considering the record as a whole."); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.") (quotation marks omitted).

Lastly, Plaintiff asserts that the ALJ failed to properly consider the Paragraph B Listings in fashioning his RFC.  This argument is without merit insofar that the ALJ specifically mentions Plaintiff's mental impairments "considered singly and in combination, do not meet or medically equal" the Listings and Plaintiff experiences no more than moderate limitations in the functional areas, referencing much of the medical findings noted above to support his finding. (*See* A.R. 26-31.)  Furthermore, the ALJ need not consider the factors for severity of an impairment when formulating the claimant's RFC.  *See Whipple v. Astrue*, 479 F. App'x 367, 369-70 (2d Cir. 2012).  Here, ALJ Penalver found Plaintiff to have moderate limitations in concentrating and maintaining pace when determining the severity of his impairments at step three.  (A.R. 27.)  And when formulating Plaintiff's RFC the ALJ found that limiting Plaintiff to simple and routine tasks with breaks every hour properly accounted for the limitation found in the previous steps.  *See e.g., Shawna Ann J. v. Comm'r of Soc. Sec., 2021 WL 733804*, at *1, 5 (W.D.N.Y. Feb. 25, 2020) (RFC determination limiting the claimant to simple, routine and repetitive tasks not performed at a production rate, making simple work-related decisions, and

occasional interaction with co-workers, supervisors and the public, accommodated Plaintiff's moderate difficulties including in the area of concentrating, persisting, and maintaining pace and adapting and managing oneself).  Accordingly, the Court finds no error.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED, and Defendant's motion for judgment on the pleadings is GRANTED.

**SO ORDERED.**

Dated: May 9, 2022
New York, New York

KATHARINE H. PARKER
United States Magistrate Judge